IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SAMSUNG ELECTRONICS CO., LTD.,  )
SAMSUNG SEMICONDUCTOR, INC. and )
SAMSUNG ELECTRONICS AMERICA,    )
INC.,                           )
                                )
                 Plaintiffs,    )      C.A. No. _____
                                )
        v.                      )      **DEMAND FOR JURY TRIAL**
                                )
NETLIST, INC.,                  )
                                )
                 Defendant.     )

**COMPLAINT FOR DECLARATORY JUDGMENT**
**OF NON-INFRINGEMENT AND FOR BREACH OF CONTRACT**

Plaintiffs Samsung Electronics Co., Ltd. ("SEC"), Samsung Semiconductor, Inc.

("SSI"), and Samsung Electronics America, Inc. ("SEA," and together with SEC and SSI,

"Samsung") seek a declaration that Samsung does not directly or indirectly infringe U.S. Patent

No. 12,646,537 ("the '537 patent") (Exhibit 1), either literally or under the doctrine of equivalents;

and, alternatively, a ruling that Defendant Netlist, Inc. ("Netlist") has breached contractual

obligations owed to Samsung, including obligations to license its purportedly essential '537 patent

to Samsung and its affiliates on reasonable and non-discriminatory ("RAND") terms and

conditions, as follows:

**NATURE OF THE ACTION**

1.      This is an action for a declaratory judgment arising under the patent laws of

the United States, Title 35 of the United States Code, and the Declaratory Judgment Act, 28

U.S.C. § 2201 *et seq*. and state contract law.

2.     This action arises out of Netlist's repeated assertions of patents against Samsung after Netlist unilaterally attempted to terminate an agreement in which Netlist granted Samsung a perpetual, paid-up, worldwide license to Netlist patents, including the '537 patent. The U.S. Patent and Trademark Office ("Patent Office") has invalidated, in *inter partes* reviews ("IPR") filed by Samsung, all claims of two patents related to the '537 patent, U.S. Patent Nos. 8,787,060 ("the '060 patent") and 9,318,160 ("the '160 patent"). IPR2022-01428, Paper No. 48; IPR2022-01427, Paper No. 48. Netlist accused Samsung High Bandwidth Memory products ("HBM Products") of infringing the '060 and '160 patents.

3.     Netlist then obtained a continuation of the '060 and '160 patents, U.S. Patent No. 12,308,087 ("the '087 patent"), a continuation patent from the same patent family as the invalidated patents. On the day the patent issued, Netlist asserted the '087 patent against Samsung in the Eastern District of Texas. After SSI and SEA raised venue challenges to proceeding in that district, Netlist asserted the '087 patent against Samsung in the International Trade Commission ("ITC"). Specifically, on September 30, 2025, Netlist filed a complaint with the ITC alleging that Samsung infringes six patents, including the '087 patent. Netlist seeks an exclusion order for certain Samsung memory module products, including HBM Products. The Patent Office subsequently instituted a Post-Grant Review ("PGR") of the '087 patent.

4.     Netlist later sought and obtained a continuation patent of the '087 patent, the '537 patent. During prosecution, Netlist filed a non-publication request so that the claims of the patent would not be published until issuance. Samsung seeks a declaratory judgment that it does not infringe the '537 patent.

5.     Alternatively, Samsung seeks relief for Netlist's breaches of contractual obligations owed to Samsung, including obligations to license the '537 patent to Samsung and its

2

affiliates on RAND terms and conditions. Under Netlist's infringement theories, the '537 patent is necessarily infringed by the practice of certain standards promulgated by the Joint Electron Device Engineering Council ("JEDEC") and implemented by the Samsung memory modules at issue in this case.

## THE PARTIES

6.    Samsung Electronics Co., Ltd. is a corporation organized and existing under the laws of the Republic of Korea, with its principal place of business at 129, Samsung-ro, Yeongtong-gu, Suwon-si, Gyeonggi-do, 443-742, Republic of Korea.

7.    Samsung Semiconductor, Inc. is a corporation organized and existing under the laws of the State of California, with its principal place of business at 3655 North First Street, San Jose, California 95134.

8.    Samsung Electronics America, Inc. is a corporation organized and existing under the laws of the State of New York, with its principal place of business located at 85 Challenger Road, Ridgefield Park, New Jersey 07660.

9.    On information and belief, Netlist, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 175 Technology Drive, Suite 150, Irvine, California 92618.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over the Complaint, which asserts a claim for declaratory judgment of non-infringement, under 28 U.S.C. §§ 1331, 1338(a), and 2201(a).

11.    This Court has subject matter jurisdiction over the breach of contract claim (Count II) pursuant to 28 U.S.C. § 1367. The breach of contract claim forms part of the same case

or controversy as the claim for declaratory judgment of non-infringement asserted by Samsung in this action.

12.     This Court has personal jurisdiction over Netlist, a corporation organized and existing under the laws of the State of Delaware.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b)–(c) because Netlist is subject to personal jurisdiction in this District.

14.     An immediate, real, and justiciable controversy exists between Samsung and Netlist as to whether Samsung has infringed the '537 patent. For example, as set out more fully below, Netlist has sued Samsung for infringement of the '537 patent in the Eastern District of Texas, *Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, No. 2:26-cv-441 (EDTX), D.I. 1 (the "EDTX V Action"), and Netlist has repeatedly asserted that Samsung memory products infringe patents in the patent family that includes the '537 patent.

**A.     Infringement Notice and Samsung's First Declaratory Judgment Action**

15.     Shortly after Netlist unilaterally declared that Samsung was no longer licensed to Netlist's patent portfolio, Netlist sent Samsung a "Notice of Infringement" letter. The letter asserted that "Netlist is the owner of over 100 patents and patent applications related to memory technologies," that Samsung "no longer is licensed to any of Netlist's portfolio of patents," and that certain Samsung memory modules infringe several of Netlist's patents related to certain memory modules—Load-Reduced Dual Inline Memory Modules ("LRDIMMs") and Registered Dual Inline Memory Modules ("RDIMMs").

16.     As discussed in detail below, *see infra* ¶¶ 49–52, on October 15, 2021, SEC and SSI filed a declaratory judgment action against Netlist in the District of Delaware. *Samsung Elecs. Co., Ltd. et al. v. Netlist, Inc.*, No. 1:21-cv-1453-JLH (D. Del.) (the "Delaware I Action"), D.I. 1. Netlist moved to dismiss SEC and SSI's declaratory judgment claims for lack of

jurisdiction. *Id.*, D.I. 11 at 3–4. The Court concluded that it had and would exercise jurisdiction over SEC and SSI's claims relating to three patents,[1] *id.*, D.I. 37 at 4–5, and Netlist counterclaimed for infringement of those patents, *id.*, D.I. 40. Netlist also brought Google, LLC ("Google"), Samsung's customer, into the case and asserted counterclaims against Google. *Id.*, D.I. 45.

**B.      Netlist's Assertion of Patents Against Samsung**

17.      As detailed *infra* ¶¶ 53–56, on December 20, 2021, Netlist began a patent litigation campaign against Samsung in the U.S. District Court for the Eastern District of Texas. *Netlist, Inc. v. Samsung Elecs. Co., Ltd. et al.*, No. 2:21-cv-463-JRG (E.D. Tex.) (the "EDTX I Action"), D.I. 1 ¶ 36. Netlist later amended its complaint to allege that certain Samsung HBM Products infringe the '060 and '160 patents. The '537 patent at issue in this case is a continuation patent of the '060 and '160 patents. In the EDTX I Action, Netlist accused many of the same Samsung HBM Products at issue in this case. Netlist advanced the '060 and '160 patents against Samsung HBM Products through trial in the Eastern District of Texas, where the jury rendered a verdict of infringement of the '060 and '160 patents in Netlist's favor and awarded damages. The case is currently on appeal. *Netlist, Inc. v. Samsung Elecs. Co., Ltd. et al.*, No. 24-2203 (Fed. Cir.).

18.      On September 30, 2025, Netlist filed a complaint with the ITC alleging that Samsung infringes six patents, including the '087 patent (the parent patent of the '537 patent). Netlist's ITC complaint accuses Samsung HBM2, HBM2E, HBM3, HBM3E, HBM4, and HBM4E of infringing the '087 patent. The ITC instituted the investigation on December 29, 2025.

---

[1]      The Court dismissed Samsung's declaratory judgment claim of non-infringement related to U.S. Patent No. 7,619,912, which had been "the subject of litigation [against Google in the Northern District of California] for over a decade," in favor of the parties litigating the patent in California. Delaware I Action, D.I. 37 at 6.

19.    More recently, shortly after midnight on the day that the '537 patent issued, June 2, 2026, Netlist filed a complaint against Samsung in the Eastern District of Texas alleging that Samsung "HBM2, HBM2E, HMB3, HBM3E, HBM4 and newer products (e.g., HBM4E; HBM5)" infringe the '537 patent. EDTX V Action, D.I. 1, ¶¶ 24, 44.

20.    In total, Netlist has sued Samsung five times in the Eastern District of Texas on numerous patents related to memory products. *See* EDTX I Action; *Netlist, Inc. v. Samsung Elecs. Co., Ltd. et al.*, No. 2:22-cv-293-JRG, D.I. 1 (E.D. Tex.) (the "EDTX II Action"); *Netlist, Inc. v. Samsung Elecs. Co., Ltd. et al.*, No. 2:25-cv-557-JRG, D.I. 1 (E.D. Tex.) ("the EDTX III Action"); *Netlist, Inc. v. Samsung Elecs. Co., Ltd. et al.*, No. 2:25-cv-748-JRG (E.D. Tex.), D.I. 1 ("the EDTX IV Action"); EDTX V Action, D.I. 1. Netlist has also filed suit against Samsung in Germany. *Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, Nos. 4c O 31/22, 4c O 45/22 (Düsseldorf Regional Court).

**C.    Netlist's Patent Infringement Suits Against Other Memory Module Manufacturers and Technology Companies**

21.    Before Netlist's patent dispute with Samsung, Netlist began a patent litigation campaign against a competitor of Samsung, SK hynix, alleging that certain memory products infringed Netlist's patents. In total, Netlist filed six patent infringement actions against SK hynix from 2016 to 2020. *See infra* ¶ 61. Throughout its litigation campaign against SK hynix, Netlist demonstrated a pattern of asserting patents, receiving rulings of non-infringement or invalidity, and then asserting, in a new action, continuation patents of the non-infringed or invalid patents. *See infra* ¶ 66.

22.    Further, Netlist has recently asserted patents—including the '060, '160, and '087 patents—against Micron Technology, Inc. and its affiliates (collectively, "Micron"), which

are competitors of Samsung with respect to at least certain of Samsung's memory products. *See infra* ¶ 65. Netlist also filed suit against Micron in Germany.

23.    Netlist has also filed infringement suits against several technology companies in California, *see infra* ¶¶ 63–64, including against Google in the Northern District of California, *Netlist, Inc. v. Google LLC*, No. 3:09-cv-05718-RS (N.D. Cal.), against Inphi Corporation in the Central District of California, *Netlist, Inc. v. Inphi Corp.*, No. 2:09-cv-6900 (C.D. Cal. 2009), and against Smart Modular Technologies, Inc.; Diablo Technologies, Inc.; SanDisk, LLC; Smart Storage Systems, Inc.; and Smart Worldwide Holdings, Inc. in the Northern District of California, *Netlist, Inc. v. Smart Modular Technologies, Inc. et al.*, No. 8:13-cv-00996 (N.D. Cal. 2013). Netlist asserted infringement counterclaims against Diablo Technologies, Inc. in the Northern District of California. *Diablo Technologies, Inc. v. Netlist, Inc.*, No. 4:13-cv-03901 (N.D. Cal. 2013). Netlist has also sued Google in Germany for patent infringement.

**D.    Netlist's Threats of Future Infringement Actions**

24.    Since the dispute between Netlist and Samsung arose, Netlist has made demands that Samsung take a second license to Netlist's portfolio of patents based on Netlist's claim that it terminated the fully paid-up, worldwide patent license granted in the parties' earlier license agreement.

25.    For instance, as noted above, on October 15, 2020, Netlist issued a "Notice of Infringement" to Samsung and demanded that Samsung take a second license to Netlist's patents. Specifically, Netlist demanded that "Samsung and its subsidiaries honor third-party intellectual property rights" and engage in "formal licensing discussions"—"reserv[ing] all rights and remedies" with respect to enforcing its patents against Samsung.

26.    Netlist has also stated in a regulatory filing that the "memory market remains poised for significant growth driven by the industry's transition to HBM" and "Netlist is

well-positioned to capitalize on this through new product development and its intellectual property portfolio." Netlist, Inc., Securities and Exchange Commission Form 8-K (May 6, 2025), blob:https://investors.netlist.com/1dce6f28-4c96-4a62-b7aa-061efc007288 (last visited June 2, 2026). Netlist has therefore stated publicly that it intends to enforce its HBM patent portfolio to "capitalize" on the growth of the market.

*********

27. In sum, as set forth herein, Netlist has sued Samsung on the '537 patent, has asserted patents in the same patent family as the '537 patent—*i.e.*, the '060, '160, and '087 patents—against Samsung HBM Products currently being sold and used throughout the United States, has accused other Samsung memory products of infringing additional patents in multiple infringement actions, and has made public comments about taking steps to enforce its HBM patent portfolio.

28. Accordingly, this action presents an actual controversy with respect to Samsung's alleged infringement of the '537 patent. The Court may and should grant the declaratory relief sought herein pursuant to 28 U.S.C. § 2201 *et seq*.

**BACKGROUND**

A. **Netlist's Extraordinary License Demand and Infringement Threats**

29. As noted above, on November 12, 2015, Netlist and SEC entered into a Joint Development and License Agreement (the "Agreement" or "JDLA"). The Agreement contains cross-license, joint development, and product supply provisions.

30. In the Agreement, Netlist granted SEC and its subsidiaries, including SSI and SEA, a perpetual, paid-up, worldwide, non-exclusive license to all patents owned or controlled by Netlist or any of its subsidiaries having an effective first filing date on or prior to November 12, 2020. The license extends through the expiration date of the last-to-expire of the licensed patents.

8

31.     SEC similarly granted Netlist and its subsidiaries a perpetual, paid-up, worldwide, non-exclusive license to all patents owned or controlled by SEC or any of its subsidiaries having an effective first filing date on or prior to November 12, 2020.

32.     The Agreement required SEC to make a payment to Netlist of $8 million subject to the terms and conditions therein. SEC made this payment to Netlist, except for a portion that was remitted as tax withholding to the Korean tax authorities, which later refunded the withheld portion to Netlist.

33.     Since 2020, Netlist has taken extraordinary actions to back out of its grant of a patent license to Samsung.

34.     On May 27, 2020, Netlist's Chief Licensing Officer, Marc J. Frechette, wrote to Mr. Seung Min Sung of SEC and alleged that Samsung materially breached the Agreement by "repeatedly fail[ing] to fulfill Netlist's request for NAND and DRAM products throughout the term of the Agreement" and, allegedly, by improperly deducting withholding taxes. Netlist did not allege, and has never alleged, that Samsung breached the Agreement in any way related to the patent cross-license. In the same letter—which was the first time Netlist raised its breach allegations—Mr. Frechette informed Mr. Sung that Netlist had filed a complaint in the U.S. District Court for the Central District of California with respect to the alleged breach by Samsung and provided a copy of the complaint for reference.

35.     On May 28, 2020, the U.S. District Court for the Central District of California docketed Netlist's breach of contract complaint against SEC. *Netlist Inc. v. Samsung Elecs. Co., Ltd.*, No. 8:20-cv-00993-MCS (C.D. Cal.) (the "Breach Action").

36.     Netlist subsequently wrote to SEC to terminate the Agreement, including the patent license to SEC and its subsidiaries. On July 15, 2020, Netlist's Chief Licensing Officer,

Marc J. Frechette, wrote to Mr. Seung Min Sung of SEC and stated that "Netlist is hereby terminating, effective immediately, the Agreement including the patent license granted to Samsung . . . ."

37. One week later, on July 22, 2020, Netlist amended its complaint in the Breach Action, seeking a declaration that the license it granted Samsung, but not the license Samsung granted Netlist, was terminated. In the Breach Action, Netlist sought monetary damages and a declaration "that Netlist has terminated the Agreement pursuant to Section 13.2 and that Samsung's licenses and rights under the agreement have ceased."

38. Netlist then issued a "Notice of Infringement" to Samsung and a demand that Samsung take a second license to Netlist's patents. Specifically, on October 15, 2020, Netlist stated that because it had terminated the Agreement, "Samsung is no longer licensed to any of Netlist's portfolio of patents." Netlist further asserted that its patents relate to "memory technologies," which includes HBM. Netlist then alleged: "Despite the termination of the Joint Development and License Agreement, Samsung continues to unlawfully utilize Netlist's innovations and to infringe Netlist's patents." Netlist concluded the letter by demanding that "Samsung and its subsidiaries honor third-party intellectual property rights" and engage in "formal licensing discussions." Netlist further stated that it "reserves all rights and remedies" with respect to the alleged infringement.

39. Netlist resumed its communications with Samsung in 2021. On February 2, 2021, Netlist's Chief Licensing Counsel, Mr. Marc J. Frechette, indicated by email that Samsung must take a second license, coupled with the demand that Netlist "be made whole" for any alleged breach asserted in the Breach Action.

10

40. Accordingly, Netlist seeks to double-dip, with a demand that Samsung take a second license to Netlist's patents.

41. On October 14, 2021, the court in the Breach Action issued a confidential order granting summary judgment in favor of Netlist on Netlist's Third Claim for Relief, which sought a declaration that Netlist terminated Samsung's license effective July 20, 2020. *See* Breach Action, D.I. 186. The court also granted summary judgment in Netlist's favor that Samsung was liable for certain alleged breaches of other provisions in the Agreement. *See id.*

42. Beginning on December 1, 2021, the court in the Breach Action held a jury trial on damages for one of the alleged breaches, the alleged failure to fulfill Netlist's orders for NAND and DRAM products. On December 3, 2021, the jury returned a verdict in Samsung's favor, finding that Netlist failed to prove that it suffered any damages for this alleged breach. *See id.*, D.I. 276. The court in the Breach Action concluded that Netlist was not entitled to damages for the remaining alleged breach (the withholding of taxes) as a matter of law and awarded Netlist nominal damages of $1.00 for each alleged breach (for a total of $2.00). *Id.*, D.I. 306, ¶¶ 1–2.

43. Despite losing at trial, Netlist issued a press release claiming to be "very pleased with the overall outcome of the case as it confirmed that Samsung no longer has a valid license to Netlist patents and therefore requires a licensing agreement." Netlist Provides Update on Action in Federal Court Against Samsung, https://investors.netlist.com/news/netlist-provides-update-on-action-in-federal-court-against-samsung/a661884d-0025-46ea-a055-bae8d8e4570b (last visited June 2, 2026).

44. SEC challenged the summary judgment ruling in the Breach Action on appeal to the Ninth Circuit. *Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, Nos. 22-55209 & 22-55247 (9th Cir.). SEC maintained that it did not breach the Agreement, that the Agreement has not been

11

terminated, and that SEC continues to hold a paid-up, worldwide, non-exclusive license to Netlist's patents, including the '537 patent.

45.     The Ninth Circuit agreed that patent cross-licensing was a distinct aim of the JDLA, independent of the joint development project: "[T]he JDLA has two stated purposes: (1) developing a new NVDIMM-P product (i.e., the [joint development project]), and (2) patent cross-licensing. The title and preamble of the agreement exclusively reference these two topics, and each substantive section corresponds entirely to one of the two goals." Breach Action, D.I. 192, Ex. A at 3–4. The Ninth Circuit remanded the case to (a) resolve an ambiguity in the supply provision in Section 6.2 of the JDLA and (b) determine whether any breach of that provision by Samsung was material such that Netlist could terminate the agreement. Following the Ninth Circuit's remand, a jury trial was held. On May 17, 2024, the jury issued its verdict, adopting Netlist's proffered meaning of the disputed provision and finding that Samsung's breach of that provision was material. *See id.*, D.I. 556.

46.     In post-trial briefing, Samsung requested a new trial. The district court granted Samsung's motion on account of implied juror bias. *Id.*, D.I. 640 at 16.

47.     On March 24, 2025, the district court held a new trial, and the jury again adopted Netlist's proffered meaning of the disputed provision. *See id.*, D.I. 769. Samsung appealed the judgment to the United States Court of Appeals for the Ninth Circuit. *Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, No. 25-5531 (9th Cir.). That appeal remains pending.

**B.     Netlist's Patent Infringement Lawsuits**

48.     Over the past decade, Netlist has pursued a litigation campaign against Samsung and other suppliers of memory modules, component suppliers, and users of memory modules (aside from Samsung). During this campaign, Netlist alleged infringement of numerous

patents, including patents related to the '537 patent, and accused several memory products of infringing these patents, including HBM Products.

### 1. Netlist's Lawsuits Against Samsung

49. As noted above, on October 15, 2021, SEC and SSI filed a declaratory judgment action against Netlist in this District for a declaration that, *inter alia*, Samsung RDIMM and LRDIMM products did not infringe, *inter alia*, the patents that Netlist included in its "Notice of Infringement" letter. Delaware I Action, D.I. 1. In particular, the complaint sought declarations of non-infringement with respect to U.S. Patent Nos. 10,217,523 (the "'523 patent"), 10,474,595 (the "'595 patent"), 9,858,218 (the "'218 patent"), and 7,619,912 (the "'912 patent"). *Id.* Netlist moved to dismiss SEC and SSI's declaratory judgment claims, arguing that no case or controversy existed because there was no imminent threat of Netlist filing suit against Samsung on the patents-in-suit. *Id.*, D.I. 11 at 3–4. SEC and SSI later amended their complaint, *id.*, D.I. 14, and Netlist moved to dismiss the First Amended Complaint, *id.*, D.I. 24.

50. On August 1, 2022, the Court in the Delaware I Action denied-in-part and granted-in-part Netlist's motion to dismiss SEC and SSI's declaratory judgment claims. The Court found that it has jurisdiction on the patents included in the "Notice of Infringement" letter because, once the Central District of California granted summary judgment in favor of Netlist in the Breach Action, "Netlist's threats became more immediate." *Id.*, D.I. 37 at 4. However, the Court dismissed, *inter alia*, SEC and SSI's declaratory judgment claim of non-infringement related to the '912 patent. *Id.*, D.I. 37. The Court reasoned that the patent had been "the subject of litigation in [the Northern District of California] for over a decade," so the declaratory judgment claim regarding that patent in Delaware was not "an efficient use of judicial resources." *Id.* at 6. In reaching its decision, the Court accepted Netlist's argument that SEC and SSI's "collateral action [in Delaware] should be dismissed in favor of the much more advanced Northern District case."

*Id.* at 3; *see also id.*, D.I. 11 at 3–5; D.I. 28 at 1–3, 8–10 (Netlist arguing that litigation on the '912 patent should proceed in the Northern District of California).

51.    Following the Court's order in the Delaware I Action, Netlist counterclaimed against SEC and SSI for infringement of all remaining patents. Netlist also sought treble damages based on SEC and SSI's alleged willful infringement. *Id.*, D.I. 45, ¶ 101. Netlist subsequently expanded its infringement allegations to include additional Samsung products. *Id.*, D.I. 132-1, Ex. 16 at 2.

52.    Netlist later asserted counterclaims against Google in the Delaware I Action for infringement of the '523, '218, and '595 patents. *Id.*, D.I. 45. Netlist's infringement allegations relate to Google's use of Samsung memory products.

53.    On December 20, 2021, Netlist filed a lawsuit against Samsung in the Eastern District of Texas alleging direct and indirect infringement of three Netlist patents. EDTX I Action, D.I. 1. Netlist alleged infringement based on Samsung's making, selling, using, and/or importing of certain memory modules. *See id.* ¶¶ 40, 53, 68.

54.    Netlist filed the EDTX I Action the same day that it moved to dismiss the Delaware I Action based on, *inter alia*, an alleged lack of any case or controversy over Samsung's declaratory judgment claims. *See* Delaware I Action, D.I. 11 at 3 (arguing that the case did not involve a "substantial controversy of sufficient immediacy").

55.    Netlist's complaint in the EDTX I Action stated that Netlist intended to assert against Samsung another Netlist patent, U.S. Patent No. 11,232,054 (the "'054 Patent"), once it issued from the Patent Office. *See* EDTX I Action, D.I. 1 ¶ 32. The '054 patent issued on January 25, 2022, and Netlist subsequently amended its complaint to include the newly issued patent. *Id.*, D.I. 23.

14

56. Netlist's amended complaint also added two additional patents: the '060 and '160 patents. *Id.* Netlist alleged that Samsung HBM Products infringe those patents. *Id.*, D.I. 23 ¶¶ 118, 128.

57. Netlist also filed a second suit against Samsung in Texas. The same day the court in the Delaware I Action dismissed Samsung's declaratory judgment claims involving the '912 patent—reasoning that litigating the patent in the Northern District of California would be the most efficient use of judicial resources—Netlist filed suit against Samsung on the '912 patent in the Eastern District of Texas. *See* EDTX II Action, D.I. 1. Netlist later amended its complaint to include three additional patents. Netlist alleged that Samsung infringed its patents by making, using, selling, offering to sell, and/or importing certain memory modules. *Id.* ¶ 34.

58. Netlist also filed suit against Samsung in Germany, asserting two patents against Samsung's memory modules. *Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, Nos. 4c O 31/22, 4c O 45/22 (Düsseldorf Regional Court).

59. On May 19, 2025, the day before the '087 patent issued, Netlist prematurely filed an infringement suit in the Eastern District of Texas against Samsung on the '087 patent (the parent of the '537 patent). *Netlist, Inc. v. Samsung Elecs. Co., Ltd. et al.*, No. 2:25-cv-00553 (E.D. Tex.). The next day, shortly after midnight, Netlist filed another infringement suit in the Eastern District of Texas, again alleging infringement of the '087 patent. EDTX III Action, D.I. 1 (E.D. Tex.). In the complaint, Netlist alleged that Samsung "directly infringed and [is] currently infringing at least one of the approved claims of the '087 Patent," with respect to "any Samsung HBM2, HBM2E, HMB3, HBM3E and newer products (e.g., HBM4) made, sold, used, offered for sale, and/or imported into the United States by Samsung." *Id.*, D.I. 1, ¶¶ 23, 27. On July 8, 2025,

15

Netlist filed an amended complaint in the EDTX III action, asserting an additional patent and adding a Samsung distributor as a defendant. *Id.*, D.I. 14.

60.     On July 29, 2025, Netlist filed yet another infringement suit in the Eastern District of Texas against Samsung seconds after the Patent Office issued U.S. Patent No. 12,373,366 (the "'366 patent") at midnight EDT. EDTX IV Action, D.I. 1. Netlist alleged infringement of the '366 patent based on Samsung's making, selling, using, and/or importing of certain memory modules. *See id.* ¶¶ 29–81.

### 2.     Netlist's Lawsuits Against Third Parties

61.     Netlist has also pursued a litigation campaign against other suppliers of memory products, component suppliers, and users of memory products. For instance, Netlist engaged in a years-long, multi-forum litigation campaign against SK hynix, a competitor of Samsung. Between 2016 and 2020, Netlist filed six patent infringement suits against SK hynix, the first two in the Central District of California. *See Netlist, Inc. v. SK hynix America Inc. et al.*, No. 8:16-cv-1605 (C.D. Cal. 2016); *Netlist, Inc. v. SK hynix, Inc. et al.*, No. 8:17-cv-1030 (C.D. Cal. 2017). Netlist also filed two complaints against SK hynix with the International Trade Commission. *See In re Certain Memory Modules and Components Thereof, and Products Containing the Same*, No. 337-TA-1023 (U.S.I.T.C. 2016); *In re Certain Memory Modules and Components Therefore*, No. 337-TA-1089 (U.S.I.T.C. 2017). Finally, Netlist filed two infringement suits against SK hynix in the Western District of Texas. *See Netlist, Inc. v. SK hynix Inc. et al.*, No. 6:20-cv-194 (W.D. Tex. 2020); *Netlist, Inc. v. SK hynix America. et al.*, No. 6:20-cv-525 (W.D. Tex. 2020).

62.     In these suits, Netlist accused certain SK hynix memory modules of infringing numerous Netlist patents.

63.     Netlist has also accused Google of infringing the '912 patent. *See Netlist, Inc. v. Google Inc.*, No. 3:09-cv-05718-RS (N.D. Cal.). Netlist seeks an injunction in that case, which would preclude Google from using Samsung LRDIMM and RDIMM memory modules. Netlist also seeks an injunction against Google in the Delaware I Action. D.I. 127 at 11.

64.     Netlist has also asserted infringement claims against Inphi Corporation, *see Netlist, Inc. v. Inphi Corp.*, No. 2:09-cv-6900 (C.D. Cal. 2009), and infringement counterclaims against Diablo Technologies, Inc., *Diablo Technologies, Inc. v. Netlist, Inc.*, 4-13-cv-03901 (N.D. Cal. 2013). Netlist also filed an infringement suit against Smart Modular Technologies, Inc.; Diablo Technologies, Inc.; SanDisk, LLC; Smart Storage Systems, Inc.; and Smart Worldwide Holdings, Inc. *Netlist, Inc. v. Smart Modular Technologies, Inc. et al.*, 8-13-cv-00996 (N.D. Cal. 2013).

65.     As noted above, Netlist has also recently asserted patents in multiple litigations in Texas against Micron, which is a competitor of Samsung with respect to at least certain of the memory products, including HBM. *See Netlist, Inc. v. Micron Tech., Inc. et al.*, No. 6:21-cv-430 (W.D. Tex.); *Netlist, Inc. v. Micron Tech., Inc. et al.*, No. 6:21-cv-431 (W.D. Tex.); *Netlist, Inc. v. Micron Tech., Inc. et al.*, No. 2:22-cv-203-JRG (E.D. Tex.); *Netlist, Inc. v. Micron Tech., Inc. et al.*, No. 2:22-cv-294 (E.D. Tex.); *Netlist, Inc. v. Micron Tech., Inc. et al.*, No. 2:25-cv-552 (E.D. Tex.); *Netlist, Inc. v. Micron Tech., Inc. et al.*, No. 2:25-cv-749 (E.D. Tex.). The Eastern District of Texas transferred the cases Netlist filed against Micron in 2025 to the District of Delaware, after the Texas court concluded that venue against Micron was improper. *Netlist, Inc. v. Micron Tech., Inc. et al.*, No. 1-26-cv-246 (D. Del.) (alleging infringement of the '087 patent); *Netlist, Inc. v. Micron Tech., Inc. et al.*, No. 1-26-cv-362 (D. Del.). Micron also filed

a declaratory judgment complaint in this District against Netlist on the '537 patent. *Micron Tech., Inc. et al. v. Netlist, Inc.*, C.A. No. 26-641 (D. Del.).

66.    As already noted, throughout its litigation campaigns, Netlist has demonstrated a pattern of asserting patents, having IPRs instituted or receiving rulings of non-infringement or invalidity, and then asserting continuations of the non-infringed or invalid patents. For example, Netlist asserted the '837 patent against SK hynix in district court and at the ITC. *Netlist, Inc. v. SK hynix Inc.*, No. 8:16-cv-01605 (C.D. Cal. Aug. 31, 2016), D.I. 1; *In re Certain Memory Modules*, No. 337-TA-1023 (U.S.I.T.C. Sept. 1, 2016), Doc. No. 589609. Shortly before the Patent Trial and Appeal Board ("PTAB") determined that certain claims of the '837 patent were unpatentable (and the ITC determined that SK hynix did not infringe the patent), *see* IPR2017-00548, Paper No. 25 (May 3, 2018); *In re Certain Memory Modules*, No. 337-TA-1023, 2017 WL 11569255, at *135 (Nov. 14, 2017), Netlist asserted a continuation of the '837 patent against SK hynix in district court and at the ITC. *Netlist, Inc. v. SK hynix Inc.*, No. 8:17-cv-1030 (C.D. Cal.), D.I. 1; *In re Certain Memory Modules*, No. 337-TA-1089 (U.S.I.T.C. Oct. 31, 2017), Doc. No. 627249. The PTAB subsequently determined that all claims of that patent were unpatentable, *see* IPR2018-00303, Paper No. 42 (Mar. 21, 2019), so Netlist asserted two additional continuation patents in the same patent family against SK hynix, *Netlist, Inc. v. SK hynix Inc.*, No. 6:20-cv-00194 (W.D. Tex. June 9, 2020), D.I. 33, essentially seeking a third bite at the apple.

C.    **Samsung's IPRs and PGR on the '060, '160, and '087 Patents**

67.    On August 26, 2022, Samsung filed petitions for *inter partes* review of the '060 and '160 patents in the PTAB. IPR2022-01428; IPR2022-01427. On April 1, 2024, the PTAB issued Final Written Decisions in both IPRs, invalidating all claims of both the '060 and '160 patents. IPR2022-01427, Paper No. 48; IPR2022-01428, Paper No. 48.

68.     Netlist has appealed the PTAB's Final Written Decisions on the '060 and '160 patents. *Netlist, Inc. v. Samsung Electronics Co., Ltd.*, 2024-2240, 2024-2241 (Fed. Cir.). Those appeals remain pending. If the Federal Circuit affirms the Final Written Decisions on the '060 and '160 patents before the Federal Circuit issues its decision in the EDTX I Action appeal, Netlist's jury verdict against Samsung on the '060 and '160 patents will be vacated.

69.     On August 25, 2025, Samsung filed petitions for post-grant review in the PTAB of the '087 patent, the parent patent of the '537 patent. PGR2025-00071. On February 18, 2026, the PTAB instituted the PGR.

### D.     Overview of the '537 Patent

70.     The '537 patent issued on June 2, 2026, from U.S. Patent Application No. 19/212,638, which was filed on May 19, 2025. The '537 patent claims priority to a chain of continuation applications, including the applications leading to issuance of the aforementioned '060, '160, and '087 patents. The first full patent application was U.S. Patent Application No. 13/288,850, which was filed on November 3, 2011, and claimed priority to a provisional application that was filed on November 3, 2010.

71.     During prosecution, the examiner rejected the then-pending claims 1–20 of the '537 patent for double patenting over the claims of the '087 patent. Netlist filed a terminal disclaimer on October 8, 2025, thereby disclaiming any statutory term that would extend beyond the expiration date of the '087 patent.

72.     The '537 patent describes a "memory package having stacked array dies and methods for reducing driver load in the memory package." Ex. 1 ('537 Patent) at 1:34–37. According to the patent, "[m]emory modules may include a number of memory packages," and "[e]ach memory package may itself include a number of array dies that are packaged together." *Id.* at 5:41–44. A "driver" is used for driving signals between dies, such as "driver 134" in Figure

19

1A. *Id.* at 1:50–60. The '537 patent states that "a load exists on each of the drivers 134, 140, 184, and 186 by virtue of the drivers being in electrical communication with the corresponding die interconnects and the corresponding circuitry of the array dies." *Id.* at 2:27–30. The '537 patent states that "to drive a signal along a die interconnect, a driver typically must be large enough to overcome the load on the driver," but "generally a larger driver not only consumes more space on the control die, but also consumes more power." *Id.* at 2:30–34.

73.     The '537 patent explains that Figure 2, which is reproduced below, "schematically illustrates an example embodiment of a memory package 200 in accordance with the present disclosure." *Id.* at 4:6–8, Fig. 2. The patent describes memory package 200 by stating that it "may include a plurality of array dies 210 (*e.g.*, array dies 210a-210d)," "a plurality of die interconnects 220 (*e.g.*, die interconnects 220a, 220b)," and "a control die 230" that "may include a number of data conduits 232." *Id.* at 5:38–39, 6:6–8, 6:65–67, 7:11–12.



FIG. 2

74.    For at least the reasons explained in Count I, the Samsung HBM Products do not infringe the claims of the '537 patent.

### E.    Netlist Has Breached Contractual Obligations Owed to Samsung

#### 1.    JEDEC and Semiconductor Memory Standards

75.    JEDEC is an independent, non-profit semiconductor engineering trade association and standardization body based in the United States. Over 300 companies in the computer and electronics industries are currently members of JEDEC, including Samsung and Netlist.

21

76.     JEDEC has become the global leader in developing open standards and publications for a broad range of semiconductor technologies, including memory products. As relevant here, JEDEC develops standards for semiconductor memory chips and modules, including standards implemented by Samsung's products.

77.     JEDEC's semiconductor memory standards enable interoperability, *i.e.*, the ability of memory products made by different manufacturers to work together with computer and electronic devices made by others. JEDEC standards are widely implemented, and, for many types of semiconductor memory products, it is imperative that they comply with JEDEC standards in order to be commercially viable.

78.     Member companies participate in JEDEC's standard-setting process through over 50 committees and subcommittees that address various technological areas. Through a collaborative process, members contribute to and vote on technical proposals for incorporation into JEDEC standards. Upon committee and board approval, new standards are promulgated and made available to the public.

79.     In some cases, JEDEC members own patents covering the technology they or others seek to have included in a JEDEC standard. A patent that includes a claim or claims that would necessarily be infringed by the use, sale, offer for sale, or disposition of a portion of a product in order to be compliant with an industry standard is referred to as a "standard essential patent" or an "SEP."

80.     Each owner of an SEP can, unless restrained, demand and obtain exorbitant royalties for the use of its patent, far in excess of the value, if any, that the patented technology would command had it not been incorporated into a standard. If unwilling to pay such excessive royalties, firms wishing to implement the standard face the risk of being foreclosed from using any

22

portion of the standard, including unpatented and public domain technologies. This threat of foreclosure, if left unchecked, puts a manufacturer's investment in developing standard-compliant products at risk and, in effect, permits the possibility that the SEP holder may capture up to the value of the standard as a whole for each unique implementer, rather than the true value of its specific contribution to the standard, independent of the incorporation of the technology into the standard. The exploitation of SEPs to extract unreasonable or discriminatory royalties is referred to as patent "hold-up."

81.     The problem of "hold-up" is exacerbated in the context of standards, like those at issue here, as to which there are large numbers of SEPs and many different firms that claim to hold SEPs. The problem is likewise compounded when the products at issue, like those at issue here, may be required to implement multiple standards. The resulting problem of excessive aggregate royalties is referred to as "royalty stacking."

82.     In order to mitigate these risks, JEDEC—like many other standard-setting organizations—has adopted a Patent Policy that seeks to ensure that owners of SEPs license those patents to manufacturers of standard-compliant products on RAND terms and conditions. Every firm that is a member of a JEDEC committee or a participant in a JEDEC committee meeting, including Netlist, agrees to abide by the JEDEC Patent Policy.

> *All Committee Members, as a condition of committee membership or committee Participation, agree to abide by JEDEC rules and procedures, including this JEDEC patent policy ("Patent Policy").*

Ex. 2 (JEDEC Manual No. 21T) § 8.2.2.1.

83.     Pursuant to the JEDEC Patent Policy, as a condition of committee membership or participation, all JEDEC committee members agree to disclose "Potentially Essential Patents" relevant to the work of the committee:

> *All Committee Members must Disclose Potentially Essential Patents, known to their Representative(s) to be Potentially Essential Patents that are owned or controlled by that Committee Member . . . .*

*Id*. § 8.2.3.

84.    The requirement to disclose "Potentially Essential Patents" extends to disclosing pending patent applications. *Id.* § 8.2.1.

85.    JEDEC committee members also agree to license "Essential Patent Claims" on RAND terms and conditions:

> *All Committee Members, as a condition of committee membership or committee Participation, agree to Disclose Potentially Essential Patents, as set forth more fully in 8.2.3, and to offer to license their Essential Patent Claims to all Potential Licensees on RAND terms and conditions, if and as consistent with 8.2.3 and 8.2.4.*

*Id*. § 8.2.2.1.

86.    JEDEC committee members also agree to license on RAND terms any "Essential Patent Claims" included in their patent applications:

> For any Essential Patent Claims held or controlled by the entity, *pending[,] or anticipated to be filed*, which are or may be required to implement a Standard that may result from the JEDEC Standard Activity, the entity hereby makes one of the following commitments: . . . A license will be offered . . . under reasonable terms and conditions that are free of any unfair discrimination.

*Id*. § 8.2.5 (emphasis added).

87.    The JEDEC Patent Policy defines "Potentially Essential Patent" as a patent that is reasonably believed to contain one or more Essential Patent Claims. *Id*. § 8.2.1. "Essential Patent Claim" is further defined as those "Patent claims the use of which would necessarily be infringed by the use, sale, offer for sale or other disposition of a portion of a product in order to be compliant with the required portions of a final approved JEDEC standard." *Id.*

24

88.     The JEDEC Patent Policy provides that the disclosure of Potentially Essential Patents "shall be made as early as reasonably possible" and documented by submission to JEDEC of either a "License Assurance/Disclosure Form" or a "Notice of Refusal." *Id*. § 8.2.3.

89.     A License Assurance/Disclosure Form (also known as a "Letter of Assurance" or "LOA") states that the committee member commits to license its SEPs to all potential licensees on RAND terms. On the contrary, a Notice of Refusal states that the member is not "willing to offer to license Essential Patent Claims . . . on RAND terms to all Potential Licensees." *Id*. § 8.2.3.1. In order to be effective, any such LOA or Notice of Refusal must be delivered to the JEDEC Legal Department within thirty (30) calendar days of a draft specification's completion. *Id.*

90.     Member companies who disclose and agree to license their patents on RAND terms do so via the aforementioned "LOA" identifying the relevant JEDEC standard(s) and making one of the two following commitments specified by the JEDEC Patent Policy:

> *For any Essential Patent Claims held or controlled by the entity, pending or anticipated to be filed, which are or may be required to implement a Standard that may result from the JEDEC Standard Activity, the entity hereby makes one of the following commitments:*
>
> (i)     *A license will be offered, without compensation, under reasonable terms and conditions that are free of any unfair discrimination to applicants desiring to utilize the license for the purpose of implementing the JEDEC Standard, subject to the terms and conditions in 8.2.4; or*
>
> (ii)    *A license will be offered, to applicants desiring to utilize the license for the purpose of implementing the JEDEC Standard under reasonable terms and conditions that are free of any unfair discrimination, subject to the terms and conditions in 8.2.4.*

*Id*. § 8.2.5.

25

91.     According to JEDEC's Patent Policy, disclosures and commitments with respect to one patent are deemed to include all patents claiming priority to the same filing. *Id*. § 8.2.1. Committee members are therefore obligated to license on RAND terms later-issuing SEPs that claim priority to patents disclosed to JEDEC.

92.     If a committee member who owns or controls patents essential (or potentially essential) to JEDEC standards does not disclose and agree to license them before the ballot closes, or notify the committee of an intention not to license through a "Notice of Refusal," the committee member will be deemed to have agreed to offer licenses on RAND terms:

> *If a Committee Member, at its discretion, elects not to submit a License Assurance/Disclosure Form (see Annex A.3) at or before the time the ballot closes and does not otherwise provide notice of an unwillingness to license in accordance with 8.2.3.1, the Committee Member and its Affiliates will be deemed to have agreed to offer to grant licenses on RAND terms and conditions for all of its Essential Patent Claims of the balloted Standard, if and as consistent with 8.2.4.*

*Id*. § 8.2.5.

93.     The JEDEC Patent Policy provides that it is to be interpreted and governed under the laws of the State of New York. *Id*. § 8.2.10. Although the JEDEC Manual 21 has been updated and amended from time to time, upon information and belief, all of the relevant provisions of the JEDEC Patent Policy have been materially the same at all times relevant hereto.

### 2.     Netlist's RAND Commitments

94.     Netlist alleges that it owns over 100 patents and patent applications related to memory technologies.

95.     Netlist is also a member of JEDEC and has joined a number of JEDEC technical committees over time. After years of membership in JEDEC, Netlist withdrew from membership in JEDEC briefly in 2011 after submitting Notices of Refusal for a number of Netlist

26

patents. JEDEC reinstated Netlist later in 2011 following Netlist's submission of LOAs for the same patents Netlist had previously refused to license on RAND terms.

96. Netlist again withdrew from membership in JEDEC committees JC-40, JC-42, and JC-45 in 2015, after submitting Notices of Refusal for many of its patents. In May 2018, Netlist requested from the JEDEC board of directors that Netlist be reinstated in those committees. The JEDEC board of directors approved the request on the condition that Netlist would agree to be bound by the JEDEC Patent Policy regarding work conducted in JC-40, JC-42, and JC-45 during the time Netlist had not participated in the committees, since and including February 27, 2015. Netlist agreed in writing to the JEDEC board of directors' terms, and JEDEC reinstated Netlist on August 14, 2018, retroactive to February 27, 2015.

97. Upon information and belief, therefore, at the time that the JEDEC standards were drafted and approved by JEDEC, Netlist was a member, attended the meetings, and/or was deemed a member of the JC-40, JC-42, and JC-45 committees that developed those standards.

98. To date, and on information and belief, Netlist has disclosed that at least 42 of its patents are essential or potentially essential to JEDEC standards.

99. The commitments that Netlist has made to license its SEPs on RAND terms constitute binding contractual obligations that may be enforced by firms seeking to implement the JEDEC standards, such as Samsung.

### 3. Netlist's Failure to Comply with Its RAND Obligations

100. Although Netlist accepted the benefits of its membership in JEDEC to induce JEDEC to incorporate technologies over which Netlist claims to have patents into JEDEC standards, Netlist has failed to fulfill its corresponding contractual commitments. Despite

voluntarily undertaking the obligation to license its alleged SEPs on RAND terms, Netlist has made licensing demands of Samsung that violate its RAND commitment.

101.    For instance, by email dated February 2, 2021, Netlist demanded that Samsung enter a second license to patents that Samsung previously licensed from Netlist, coupled with a demand to "be made whole" for any alleged breach under the Agreement. Specifically, Netlist stated that "Samsung will require a new license to our patent portfolio"—which would include the '537 patent—and requested "[d]amages that Netlist has incurred as a result of Samsung's material decrease of product supply to Netlist following Q1 2017 and how Netlist might be made whole." Netlist has continued to demand that Netlist take a second license to its patent portfolio, which includes the '537 patent, and has made multiple non-RAND license demands since June 2023,  including on January 27, 2025, February 4, 2025, and August 20, 2025.

102.    If the '537 patent is essential to any of the JEDEC standards (which it is not), Netlist is obligated to license the patent on RAND terms. As discussed below, Netlist has failed to offer such a license to Samsung.

**<u>COUNT I</u>**
**(Declaration of Non-Infringement of the '537 Patent)**

103.    Samsung restates and incorporates by reference the preceding paragraphs as if fully set forth herein.

104.    The Patent Office issued the '537 patent, titled "Memory Package Having Stacked Array Dies and Reduced Driver Load," on June 2, 2026. On information and belief, Netlist claims to own all rights, title, and interest in the '537 patent. A true and correct copy of the '537 patent is attached hereto as Exhibit 1.

105.    The '537 patent has three independent claims: 1, 8, and 14. For example, claim 1 reads as follows:

28

| Element | Claim Language |
|---|---|
| preamble | 1. A dynamic random access memory (DRAM) package, comprising: |
| (a) | an interface including terminals; |
| (b) | stacked DRAM dies, including a first plurality of DRAM dies and a second plurality of DRAM dies; |
| (c) | a control die coupled between the stacked DRAM dies and the interface; and |
| (d) | die interconnects, each of the die interconnects including through silicon vias (TSVs) through at least some of the stacked DRAM dies; |
| (e) | wherein: the DRAM package is configured to receive/output data signals via the interface in response to command/address (C/A) signals received via the interface; |
| (f) | each DRAM die of the stacked DRAM dies includes C/A ports and data ports, and is configurable to receive/output data signals via the data ports in response to C/A signals received via the C/A ports; |
| (g) | the die interconnects include first die interconnects, the first die interconnects include first C/A interconnects and first data interconnects, the first C/A interconnects are configured to conduct C/A signals from the control die to the first plurality of DRAM dies and the first data interconnects are configured to conduct data signals between the control die and the first plurality of DRAM dies; |
| (h) | the die interconnects further include second die interconnects, the second die interconnects include second C/A interconnects and second data interconnects, the second C/A interconnects are configured to conduct C/A signals from the control die to the second plurality of DRAM dies, and the second data interconnects are configured to conduct data signals between the control die and the second plurality of DRAM dies; |
| (i) | the first plurality of DRAM dies are configured to not receive or output any signals via any of the second die interconnects; |
| (j) | the second plurality of DRAM dies are configured to not receive or output any signals via any of the first die interconnects; |
| (k) | the control die includes signal conduits, and each signal conduit is coupled between a die interconnect of the die interconnects and a terminal of the terminals; |
| (l) | the signal conduits include first data conduits coupled to respective die interconnects of the first data interconnects, and second data conduits coupled to respective die interconnects of the second data interconnects; |
| (m) | the first data conduits and the second data conduits are configurable to concurrently drive respective data signals to respective die interconnects of the first data interconnects and the second data interconnects; |

29

| Element | Claim Language |
|---|---|
| (n) | the signal conduits further include first C/A conduits coupled to respective die interconnects of the first C/A interconnects, and second C/A conduits coupled to respective die interconnects of the second C/A interconnects; and |
| (o) | the first C/A conduits and the second C/A conduits are configurable to concurrently drive respective C/A signals to respective die interconnects of the first C/A interconnects and the second C/A interconnects. |

106.    Samsung has not directly or indirectly infringed any claim of the '537 patent, either literally or under the doctrine of equivalents, at least because the Samsung HBM Products do not employ, incorporate, or otherwise make use of all of the limitations of the claims of the '537 patent.

107.    For example, claim 1 requires, *inter alia*, "die interconnects [that] include first die interconnects, the first die interconnects include first C/A interconnects and first data interconnects, the first C/A interconnects are configured to conduct C/A signals from the control die to [a] first plurality of DRAM dies and the first data interconnects are configured to conduct data signals between the control die and the first plurality of DRAM dies; the die interconnects further include second die interconnects, the second die interconnects include second C/A interconnects and second data interconnects, the second C/A interconnects are configured to conduct C/A signals from the control die to [a] second plurality of DRAM dies, and the second data interconnects are configured to conduct data signals between the control die and the second plurality of DRAM dies; the first plurality of DRAM dies are configured to not receive or output any signals via any of the second die interconnects; the second plurality of DRAM dies are configured to not receive or output any signals via any of the first die interconnects." The Samsung HBM Products do not satisfy these claim limitations. In the Samsung HBM Products, the claimed "first plurality of DRAM dies" receive signals via the claimed "second die interconnects," and the claimed "second plurality of DRAM dies" receive signals via the claimed "first die interconnects."

30

108.   As another example, claim 1 requires that "the first C/A conduits and the second C/A conduits are configurable to concurrently drive respective C/A signals to respective die interconnects of the first C/A interconnects and the second C/A interconnects," and claim 8 requires that "the first C/A conduits are configurable to drive a first set of C/A signals to the first plurality of DRAM dies via the first C/A interconnects concurrently with a second set of C/A signals being driven by the second C/A conduits to the second plurality of DRAM dies via the second C/A interconnects." The Samsung HBM Products do not meet these limitations, at least under Netlist's apparent infringement theory. *See, e.g.*, *Netlist, Inc. v. Samsung Electronics Co., Ltd. et al.*, No. 2:26-cv-441 (E.D. Tex.), D.I. 1, ¶ 54 ("[E]ach channel of a HBM package can be accessed in parallel to provide the wide-interface architecture, in which the associated data signals and C/A are received in parallel by the respective channel. This implies that the first C/A and data conduits and the second C/A and data conduits are configurable to concurrently drive respective C/A and data signals to respective die interconnects of the first C/A and data interconnects and the second C/A and data interconnects.").

109.   As a further example, claim 14 requires "each DRAM die of the stacked DRAM dies includes DRAM cells, C/A ports, and data ports, and is configurable to receive/output data signals via the data ports in response to C/A signals received via the C/A ports" and "a first die interconnect of the first die interconnects is configurable to be coupled to a first terminal of the terminals via a first conduit, and a second die interconnect of the second die interconnects is configurable to be coupled to the first terminal via a second conduit of the conduits." The Samsung HBM Products do not satisfy these limitations at least because they do not have data interconnects that share a data terminal as claimed.

31

110.    The Samsung HBM Products do not infringe any of claims 2–7, 9–13, and 15–20 at least because these claims depend directly or indirectly from one of claims 1, 8, and 14.

111.    Samsung, its customers, and its end users are not liable for infringement of the '537 patent for any Samsung HBM Products made, imported, or sold under license from Netlist.

112.    A substantial, immediate, and real controversy exists between Samsung and Netlist regarding whether Samsung or its customers or end users infringe the '537 patent by making, using, selling, and/or offering for sale the Samsung HBM Products in the United States, or by importing the Samsung HBM Products into the United States. A judicial declaration is necessary to determine the parties' respective rights regarding the '537 patent.

113.    Samsung seeks a judgment declaring that Samsung and its customers and end users do not infringe the '537 patent, either literally or under the doctrine of equivalents, by making, using, selling, and/or offering for sale the Samsung HBM Products in the United States, or by importing the Samsung HBM Products into the United States, either directly under 35 U.S.C. § 271(a) or indirectly under 35 U.S.C. § 271(b)–(c).

## COUNT II
### (Alternative Claim for Breach of Contract)

114.    Samsung restates and incorporates by reference paragraphs 1-73 and 75–102 as if fully set forth herein.

115.    In the alternative, if the JEDEC-compliant Samsung HBM Products infringe claim 1, or any other claim, of the '537 patent, that claim is standard essential, and Netlist has breached its contractual RAND obligations. Specifically, if the Samsung HBM Products infringe claim 1, or any other claim, of the '537 patent, then that patent claim is essential to certain JEDEC HBM standards, such as JESD235, JESD238, and/or JESD270. To the extent the '537 patent is

32

essential to any of the JEDEC standards, Netlist has breached its contractual obligations to license such patent to Samsung on RAND terms and conditions.

116. The JEDEC Patent Policy constitutes a valid and binding contract between Netlist and JEDEC.

117. Under the JEDEC Patent Policy, Netlist has a contractual commitment to offer implementers of the JEDEC standards, including Samsung, licenses to any Essential Patent Claims (as defined in the JEDEC Patent Policy) on RAND terms and conditions. Netlist therefore committed to license its patents "under reasonable terms and conditions that are demonstrably free of any unfair discrimination." Under the JEDEC Patent Policy, those commitments extend to the claims of the '537 patent, to the extent those claims are essential to the JEDEC standards.

118. This contractual commitment is ongoing. Netlist continues to have an obligation to license its SEPs to Samsung on RAND terms, notwithstanding any alleged breach of the JDLA or any alleged termination of the license contained therein.

119. Samsung is a third-party beneficiary to the JEDEC Patent Policy and/or Letters of Assurance, and to Netlist's RAND obligations thereunder. Participation in JEDEC committees and the standard-setting process is expressly conditioned on a commitment to license essential patents to third-party implementers on RAND terms. Ex. 2 (JEDEC Manual No. 21T) § 8.2.2.1. The JEDEC Patent Policy is therefore intended to benefit third-party implementers of JEDEC standards, such as Samsung, and the obligations under the JEDEC Patent Policy, including the RAND obligations, are intended to be enforceable by third-party implementers of the JEDEC standards. Third-party implementers, such as Samsung, are also the only parties who could recover for Netlist's breach of its obligations under the JEDEC Patent Policy.

33

120.    Samsung has relied on the JEDEC Patent Policy, including the RAND obligations set forth therein, in designing, manufacturing, and selling standard-compliant products, including the Samsung HBM Products, and Samsung has supported the JEDEC standard based on its understanding and expectation that JEDEC members, including Netlist, will abide by their obligations.

121.    Having entered the JDLA, Samsung showed that it is a willing licensee.

122.    In ongoing litigation, Netlist and Samsung dispute whether Samsung has a license to Netlist's patents, including the '537 patent, under the JDLA. Netlist has taken the position that Samsung's license under the JDLA has been terminated, while Samsung maintains that the termination was not effective and that it has a license to the '537 patent. As set forth above, Netlist has demanded that Samsung enter a second license to patents that Samsung previously licensed from Netlist, specifically demanding that because of the alleged JDLA termination "Samsung will require a new license to our patent portfolio," which would include the '537 patent.

123.    Although Netlist accepted the benefits of its membership in JEDEC, Netlist has failed to fulfill its corresponding contractual commitments. In particular, since the date of Netlist's purported termination of the JDLA to the present, Netlist has failed to offer Samsung a license to patents that are purportedly essential to the JEDEC standards, including the '537 patent, on RAND terms and conditions. The non-RAND license demands that Netlist has made of Samsung, including demands made on January 27, 2025, February 4, 2025, and August 20, 2025, violate its RAND commitment.

124.    As a result of Netlist's breaches of contract, Samsung has been injured in its business or property because it has been denied access to a license to Netlist's claimed SEP on RAND terms, a license that can only be obtained from Netlist. Netlist's conduct threatens Samsung

with imminent loss of customers and potential customers, loss of goodwill and product image, loss of sales, litigation costs, uncertainty in business planning, and uncertainty among customers and potential customers.

## JURY DEMAND

Samsung demands a jury trial on all issues and claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Samsung prays for judgment and relief as follows:

(a)     Declare that Samsung does not directly or indirectly infringe the '537 patent, either literally or under the doctrine of equivalents, and that it is not liable for damages or injunctive relief based on any claim in the '537 patent;

(b)     In the alternative, declare that Netlist is liable for breach of contract; and

(1)     Grant injunctive relief requiring that any Netlist demand that Samsung take a license to the '537 patent—to the extent the patent is found to be essential to the JEDEC standards—must be on reasonable terms and conditions that are demonstrably free from any unfair discrimination;

(2)     Enjoin Netlist from further demanding excessive, non-RAND royalties from Samsung for alleged infringement of the '537 patent;

(5)     Compensate Samsung for all damages caused by Netlist's breaches of contract, including breaches of its RAND obligations;

(c)     Declare that judgment be entered in favor of Samsung and against Netlist on Samsung's complaint;

(d)     Find that this is an exceptional case under 35 U.S.C. § 285;

(e)     Award Samsung pre-judgment and post-judgment interest;

35

(f)      Award Samsung its costs and attorneys' fees in connection with this action;

and

(g)      Such further and additional relief as the Court deems just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

_____

Rodger D. Smith II (#3778)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
rsmith@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Brian Nester
Peter Swanson
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC  20001-4956
(202) 662-6000

Thomas Garten
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA  94105-2533
(415) 591-6000

June 2, 2026